We will hear argument next in Case 19-351, the Federal Republic of Germany v. Philipp. Mr. Fryman? Thank you, Mr. Chief Justice, and may it please the Court. When Congress enacted the expropriation exception in 1976, communist states had been engaging in widespread expropriation of property from American nationals and denying that the international law of takings required them to pay compensation. Congress enacted a series of targeted measures, including the expropriation exception, to counter these states' rejections of the law of takings. The exception lets U.S. courts hear claims against foreign sovereigns when rights in property taken in violation of international law are an issue. That language invoked the established international law doctrine known as the law of takings. As the restatement and other sources show,  and by referring to it, Congress incorporated its limits into the expropriation exception. The plaintiffs ignore this context, trying to turn this modest exception into a novel tool for suing foreign sovereigns for human rights and law of war violations occurring in their own countries. That reading should be rejected for three reasons. First, it ignores the established meaning of the exception's words when enacted in 1976. Second, it creates a jurisdictional mismatch with the exception's text. The exception focuses on rights in property. Giving jurisdiction over property claims, it would be bizarre for courts to decide that the state has violated human rights law by murdering its own nationals just as a jurisdictional hook to hear a property claim. Finally, every applicable canon points away from a reading that would depart sharply from the restrictive theory, put the U.S. deeply in breach of the international law of state immunity, blur the jurisdictional lines over foreign sovereigns where clarity is needed most, cause friction in foreign relations, and risk reciprocal treatment against the U.S. Congress can take these risks if it wants to, but it hasn't yet. Counsel, just to make sure, your position is because this suit involves property rights, it should not be regarded as a qualification of international law or a case in which genocide is a pertinent issue in deciding the question of jurisdiction. That's right, your honor. We believe that A3 explicitly is invoking and referring to the international law of takings that the legislators would have known in 1976 when enacting the statute against that backdrop. Well, why then do you think that expropriation of property can't be part of a campaign of genocide? Well, property can be expropriated in a number of contexts, but the gravamen of A3 is the taking of property and the law that it's referring to is the international law of taking. I think a genocidal taking, as your conditions of life calculated to physically destroy a people, but it's not a taking of property within the meaning of the expropriation exception. Well, I guess my question is why that is. If it is part of a campaign of genocide, that doesn't alter the fact that it's simply taking property? Well, I think there's three reasons, your honor, in terms of the evidence that Congress was intending to invoke the international law of takings in A3. The text, of course, is referring to language of international law, so the question is what takings are wrongful under international law, and the restatement provision operable at the time answered that question with the section asking when are takings wrongful under international law. I think the second is the statutory context. You had the Sabatino decision of this court followed by a series of targeted responses of increasing force to foreign nations that refused to recognize the existence of the international law of takings. Thank you, counsel. Justice Thomas. Thank you, Mr. Chief Justice. Counsel, I understand your argument about the respect to taking, but just imagine that there's a campaign, first of all, of genocide, but in conjunction with and part of that, there's an effort to take all of the property, including jewelry, art, and even the extraction of gold teeth, for example, taking of things like spectacles. You can go down the list of some of the awful things that were done. Can that be a part of genocide, not separate from genocide? Well, Your Honor, if, in fact, a country is taking property with the intent of physically destroying a people or a part of a people, it's unquestionably a genocidal act, but the question, again, is what Congress intended in A3. Was it invoking anything that could be described as a taking, or does it have to be the gravamen of the claim? Here, the gravamen of the claim in the example you gave would be genocide, but Congress did not see fit to create any kind of exception for genocide claims or other international human rights or law of war claims. Don't you think that 1605H and the way that it allows for the systematic campaigns of coercive confiscation of cultural art, doesn't that suggest that when it's aimed at a vulnerable group, that it is actionable under FSIA? I think the important thing to recognize about the Clarification Act is that it did not amend A3 and took it as a given, and the key here is what A3 says and what the words meant then. H clarified the commercial nexus requirement and saying that, in general, an art loan from another country isn't commercial activity in the U.S., but it created a carve-out for Nazi-era claims. That carve-out just left the pre-existing commercial nexus definition, but it also, H expressly leaves the definition of property taken in violation of international law untouched. Thank you, Counsel. Justice Breyer? Well, and I write in thinking that a pundit, Mr. Smith, wants to sue a foreign country because he was injured during a genocide, deliberately, seriously injured. Now, he might be able to bring a person who participated, perhaps, but he cannot sue the government, is that right? That's correct. Okay. So now we're looking for whether he could sue the government, although otherwise he couldn't. If the government, instead of hurting him, and maybe they did hurt him too, but he might be able to sue for some of his things of value, is that correct? That's the plaintiff's theory, Your Honor. That's the plaintiff's theory. All right. So why is it, this is a slightly different question, and it's just to satisfy my own curiosity, but really, 75, 85 years later, this seems to be the first case that has arisen on this theory. Am I right? Is there precedent? Your Honor, these cases began to arise a few years ago, the Fisher and Abolish cases in the Seventh Circuit, and then the two cases you're hearing today. Until then, as Your Honor noted, in the Altman case, the consensus view was that these cases could not be brought. Well, how did Mrs. Altman recover? Well, Mrs. Altman, in fact, was a Czechoslovakian national, and her property was taken- But still, she had Czechoslovakian... Oh, I see. Mrs. Altman was, but her aunt wasn't. Well, the plaintiff in the case, the person from whom the property was taken, was a Czechoslovakian national. So that was not a- That was an expropriation in violation of the- Oh, okay. I see. Thank you. Thank you. And Your Honor, I would add that in the Malevich case, which is the case that gave rise to the Clarification Act, the same was true. That was a Dutch taking from a Russian national. Justice Alito? The ancestors of the plaintiffs in this case were all German nationals? Yes, Your Honor. What if they were stripped of their citizenship prior to the taking of the property? Well, I'd say a few things in response to that. First of all, the entity from which the property was allegedly taken was a company, the consortium, which was itself owned by three firms underneath that, which were also companies. So this is a case of claims takings from German national companies. But in response to your question as to the individuals, the individuals here, this sale transaction was finalized in the summer of 1935, according to the amended complaint, which is before the Nuremberg Laws went into existence, before Jewish Germans were stripped of German citizenship. So it wouldn't be relevant here. Finally, to the extent that they were stripped of citizenship, the question under the International Law of Takings is not the citizenship, but it is the nationality of the individuals. Well, that would get into some very difficult questions concerning the nationality of people who lived in parts of Eastern Europe that had been disputed among the countries in that region for some time. But getting back to the issue of timing, in the Clarification Act of 2016, Congress defined the covered period as beginning in 1933. So in Germany, were there takings in violation of international law under your interpretation prior to 1938? In other words, cases in which the property of non-German Jews was taken by the Third Reich? There's nothing in the record with regard to that either way, Your Honor, but I have no doubt that that occurred. Well, if it occurred, would it be more than a trivial number of cases? And if so, why would Congress have gone out of its way to define the covered period as beginning in 1933? I can't speak as to the number of cases that it was. That's a historical question, again, has not been mitigated here. But I would say as to why Congress would define the covered period as beginning in 1933, Congress was doing something very simple. It was saying the entire Nazi era, from the time that the Nazis came to the power until the time that they were defeated by Allied forces. Justice Sotomayor? Counsel, what is your position about the arguments presented in the Hungary case? As you know, Justice Sotomayor, we raised, as the second question presented, the same comedy issue that this Court has just heard argument on in the Simon case. And we, in large part, agree with the comments made by counsel for Hungary and for the Solicitor General in that case. You do not have, however, a remaining claim in which we would have to decide the comedy issue if we decide against you on this main issue, hypothetically. If you decided in our favor in this case, there would be no... If you decided in our favor on this issue, then there would be no reason for you to reach the comedy question in our case. Number two, we are generally instructed, self-guided, to rely on the plain meaning of the words that are presented in the statute. And the plain words in the statute here is in violation of international law. And it's clear to me that genocidal acts of taking property, even from nationals, would be an act of genocide. I think that's clear from the Clarification Act today. So why don't we follow the plain meaning of the statute? And why should we look to customary international law as opposed to simply the plain meaning of the words? Well, I think, Your Honor, you have to look at the plain meaning of the words in their context and in their time. And as Bostick made clear recently, when there's a difference in the meaning at the time of enactment as opposed to the present day, and there's evidence of that, you do need to look to that. Here we have a situation where the House report specifically refers to a taking in violation of international law as a term, which means that it's referring to a body of law. And it cites the second Hickenlooper Amendment. It cites this court's decision in Alfred Dunhill, which was involving Cuban expropriations, came down just months before the FSIA. Justice Kagan? Yes, Mr. Freeman, we look to the meaning in its time. But I guess I don't quite understand what words in the statute meant something different in its time. Rights and property mean the same thing. And then you have, you know, taken in violation of international law. I understood you to concede the point that property can be taken in as part of, as an important element of genocide, so that property can be taken in violation of international law. So why doesn't that just solve the problem? It's a matter of reading the plain meaning of the text, what it meant then as well as what it means now. I think the important thing is to read the clause as a whole. And the term here is taken in violation of international law, which, as noted, was something that had a defined meaning in the international law of takings, which is what Congress was addressing and responding to the communist expropriations. I guess, Mr. Freeman, it's clear that Congress was thinking about a certain thing primarily, which was the expropriation context. But the Congress wrote warrants, which didn't deal only with that thing, but which applied more broadly, and seems to cover the kind of property taking that issue in this case. I don't think so, Your Honor, because I think the question is, what's the gravamen? If there's a claim that there were conditions of life that were created that led to the potential destruction of a people, that's a claim of genocide. That's involved with taking claims. Now, if you look at the other parts of the- I understood you to say the opposite a little while ago, that you weren't contesting that the taking of property rights can constitute genocidal acts. Certainly, taking property can create conditions of life that are intended to destroy a people, and that clearly is a violation of the law of genocide. But that doesn't mean that it's a violation of the law of takings. And this provision of the FSIA is creating a narrow exception for violations of the law of takings. There are other parts of- Thank you. Thank you, Mr. Feynman. Justice Gorsuch? Good morning, counsel. I'd like to return to the question of what do we do about a stateless people? You indicated that the Jewish victims of the Holocaust were stripped of their citizenship, but not nationality, and are therefore still barred by the domestic takings rule. But if they can't access the domestic takings laws because they're no longer citizens, in what respect could that rule bar them? Let me respond in three parts, Your Honor. First of all, the question of statelessness is not a question that was raised by the plaintiffs in this case in the district court, court of appeals, or here. So this is entirely a forfeited question, one that the court need not address, and in fact hasn't been developed in any way. The second point is that, just to remind you, the claims are that this transaction occurred in the summer of 1935, which is- Let's put aside the dates and the facts. Your third answer to Justice Alito, suppose that they were in fact stripped of their citizenship before the taking, but that you said that doesn't matter because they're still nationals. I'm asking you, in what relevant sense does that make a difference? That would require this court to go down the path of determining the international law of taking under the international law of nationality, and if it were read- The international law of takings is not a human rights principle, it's a principle of nation to nation rights and of the transfer of wealth. And in that sense, this would create an enormous expansion of the international law of takings if you viewed people who were stateless as being somehow immune from the ordinary rules of the international law of takings. So the domestic law, taking law, as far as you're concerned, would permit a state to forbid almost everybody in its jurisdiction from any recourse and pose no problem? I mean, to be fair, Your Honor, again, this is not something that's been briefed, so I can't really say. I can only say that here, where there's no question that people were citizens and nationals, the international- All right, last question. I'm sorry to interrupt, but time requires me to do so. You say it was forfeited, but of course, the plaintiffs won their subject matter jurisdiction on other grounds. If we were to find in your favor, shouldn't they be given a shot to make this argument on remand? I don't think so, Your Honor. I mean, they could have raised it at any point in response to our arguments that this was beyond the scope of the international law of takings, that they never did. Matter of fact, even in their opposition brief here, they don't. They just point out that they believe that the rule shouldn't apply in the context of genocide. Justice Kavanaugh? Thank you, and good morning, counsel. Page 10 of your reply brief, you say, and I'm quoting, it is literally possible to read the exception to mean takings that violate any principle of international law, end quote. And to follow up on questions asked by Justices Sotomayor and Kagan, why isn't that the end of the case? I mean, this court held in somentard that the mere fact that something is literally possible does not mean it's what the text meant. And in Dolan, this court has noted that reading a statute to the outer limits of its definitional possibilities is sometimes an error. In the context of the FSIA, this court has made repeatedly clear that it's important to remember what Congress was going after. What Congress was going after was codifying the restrictive theory and read this to the outer limits of its definitional possibilities to cut this phrase apart into different pieces and say it can cover this, is to create friction in international relations. It's to risk reciprocity in the ways discussed in the previous case. Thank you. Justice Barrett? So, counsel, you said earlier that the expropriation exception, there would be jurisdiction for a U.S. court to hear a claim by a foreign national against, say, Germany for a claim that Germany took that foreign national's property as part of the genocide of the Holocaust under the international law of takings. And Judge Katz has pointed out in his dissent from denial of rehearing en banc that in the context of the kinds of claims that the plaintiffs asserted here, that the scheme they propose oddly matches the jurisdictional equivalent of a thermonuclear weapon, determining the scope of genocide to the merits equivalent of swatting a fly, which is looking at the underlying merits, determining whether there was a common law conversion. Would, in the private context that everybody agrees could go forward under the international law of takings, if this were a suit brought by foreign nationals, would that identify here having to determine the scope of a genocide or does resort to the international law of takings give the court a clean way of deciding it without having to get into the human rights aspect? It gives the court the clean way, Your Honor, because the court just has to decide, was the claimant a national of another state? And then the basic parameters of the international law of takings, was there compensation given? Was it prompt and effective? So it doesn't raise those extraordinary foreign relations concerns that are raised when district courts are asked to determine whether there's a violation of the law of genocide or systematic racial discrimination or the laws of war. Could it still raise the concerns implicated by a very, very large judgment against a foreign country? Well, there's the possibility of a large judgment depending on the circumstances, Your Honor. I don't think the FSIA puts any limit on that except to preclude punitive damages. Thank you. A minute to wrap up, Mr. Freiman. Thank you. I'd like to, I guess, raise three reasons for skepticism about the broad reading of a three the plaintiffs provide. And the first two track what you heard earlier in Simon. Under plaintiff's view of the expropriation exception, it's easier to sue a foreign sovereign than it is to sue a private defendant under the ATS. Because under the ATS, Kia Bell makes clear that foreign cubed cases don't belong in U.S. courts. The second is there's no serious accounts of reciprocity concerns. Those were laid out ably by counsel for Hungary. I need not repeat them, but they're extraordinary here when we're talking about subjecting a foreign sovereign to potential liability for the gravest human rights abuses in history. The third is clarity with regard to jurisdiction, especially for this court made clear that clarity is particularly important. In our view, it's there is the international law of taking in their view. It's unbounded, any international law that anyone can think of in the human rights or law of war context. Thank you, counsel. Mr. Giegler. Mr. Chief Justice, and may it please the court. The United States deplores the atrocities committed against victims of the Nazi regime and has long had a policy of encouraging Germany and other countries to provide mechanisms to afford a measure of justice. Respondents, though, have sought to sue in U.S. court, but the exception to sovereign immunity on which they rely is limited to violations of the international law of takings or expropriations, which has long prohibited only the taking of a foreign national's property if done without compensation. That interpretation is confirmed by the parallel provision of the restatement in effect when the FSIA was enacted, and the exception's statutory history as part of Congress's response to the uncompensated expropriation of Americans' property by Cuba and others. By contrast, to read the expropriation exception as opening U.S. courts to suits based on human rights violations would constitute a major departure from the FSIA's tax structure and context and require U.S. courts to make sensitive judgments about a of persons within its territory. Mr. Kneedler, you began by mentioning the United States policy of encouraging dispute resolution mechanisms to address questions such as the one before us. How do you judge the adequacy of those alternatives, and isn't that something that should enter into our determination about whether the takings remedy should be available under international law? No, I don't think so. It seems pretty clear at the time that the only international law addressing takings was the law of expropriation, which had to do with whether compensation was awarded to a foreign national. So the question of any remedies between a state and its nationals was entirely internal. Well, but that's the main policy, as I gather, of the United States, is simply to encourage other countries to provide mechanisms for compensation. And if that fails, then that's just too bad. Well, again, under the that is right. The relationship between a state and its own nationals was a matter that other nations had no right to complain about. The domestic takings law is really the converse of the rule that international law does prohibit the uncompensated taking of the property of nationals of another country because that violates the rights of that other country. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Kneedler, I'm interested in what you think of the stateless people or people who have been denaturalized, as Justice Alito brought up. We have not addressed that, and that issue has not been developed in this case. And I don't feel that I'm in a position to address it here in this court. If the court thinks that it is worth focusing on or should be focused on, it would be open on remand to see whether that has been waived and what the ramifications are. But there are, perhaps, some questions about that. And I think the question would have to take into account the formulation of the rule, which is that international law prohibited the uncompensated taking of an alien's property or the national of another nation. Now, how that would play out, whether there's some other way to look at it with respect to stateless persons, persons deprived of citizenship, that is something that the courts on remand could consider if that issue has been preserved. But doesn't it draw into question, Mr. Kneedler, the difference in treatment between a citizen of a sovereign and a non-citizen of a sovereign, with the non-citizen, of course, being able to sue that sovereign under FSIA, but the citizen not being able to? And then the big question mark with respect to the denaturalized or stateless person. Well, again, that question has not, how that plays out has not been developed. But the reason why the national of another nation can sue is because the domestic takings rule, it is a product of state responsibility to another state, and an individual national of that state can sue for an expropriation. Now, how the loss of citizenship or deprivation of citizenship would play out within the expropriating country is something that has not been developed in this case. Justice Breyer? This is a 30,000-foot question, so you may not have an answer. But in reading this, I thought, well, it's been for quite a long time that the United States has favored some kind of reparations for victims of all kinds of real horrors in the world. Genocide, apartheid, slavery, we heard that the other day, and they still go on. Certainly here, the disadvantage, you point out, of reading this statute the way you don't want it a case under the ATS is now interpreted. Stuart Eisenstadt said these things should be worked out through informal mediation and other kinds of negotiations. I'm not sure if they've been done. So has it now turned that this is the only way? It's either nothing to deal with these problems to get some kind of compensation, or we're left with our great efforts, had to have achieved almost nothing. The United States for 20 years has been urging countries to adopt. First of all, right after the war, there were a number of reparations and compensation programs for victims. In more recent times, starting with the Washington Principles, the United States has been a leader in urging other countries to establish their own mechanisms for the restitution, tracking down and restitution or compensation for property that has been taken. Different countries have responded some more fully, others less so. The United States continues to urge and work with those countries, particularly Germany. There was a joint statement issued in 2018 in which the United States recognized that more needed to be done with respect to the advisory commission that Germany has set up. There are questions about whether remedies would be available in German law. The Washington Principles rest on an understanding that different countries may have different approaches to these questions. Some could be lawsuits, some could be mediation panels, arbitration panels, things like that. Justice Alito? We've talked about the stripping of citizenship. What about the acquisition or the forced acquisition of citizenship? Was a Jew who lived in Austria barred by the domestic takings rule after Germany forcibly annexed Austria? What about a Jew living in the Sudetenland, for example? Well, I think there could be questions about who was the government of that territory at the time. Was there a B.C. government that would be the responsible government or was it directly governed by Germany? There could be questions like that that would involve questions not directly involved here. I understand. Perhaps it's not a fair question to require you to respond to, but I think this is. Could you address the question that I asked earlier about the definition of a covered period in the 2016 Clarification Act? I think it's important to recognize that what the 2016 Clarification Act did was really preserve the ability of someone who had a claim in that covered period to rely on the loaning of property for the commercial nexus. It left untouched whether there was a violation of international law and what that term means. Rather than bringing those claims within the immunity that was granted under that special statute when property was brought into the United States, it accepted these claims for that period from that new immunity, but it left them otherwise as they were. Therefore, it's necessary to go. Congress was being comprehensive by including the entire period of the Nazi regime so that all those claims would be able to take advantage of that jurisdictional nexus. Again, it left untouched the question of what taken in violation of international law means. In fact, it specifically refers to that period. Justice Sotomayor? Counsel, to what extent have other nations created or done away with sovereign immunity for takings either from nationals or non-nationals? The U.S. has done it, you claim, for takings involving non-nationals, but how many other countries have done the same thing, waived sovereign immunity in those situations automatically? Virtually none. Certainly, none have waived with respect to claims or abrogated or created an exception for claims based on domestic takings. I guess, to me, I'm sorry for interrupting you, but we are on limited time. If we're already an exception to the rule, I don't see then why we have to read the exception to the rule with the principles that would guide us with respect to the U.S.'s self-interest. Why we shouldn't just read the customary international law when customary international law, frankly, doesn't waive sovereign immunity at all? This was a very modest exception when it was adopted. It was intended to be, and it was an outgrowth of a piece with Congress' efforts to respond to the uncompensated garden variety, or whatever you want to call them, the regular sorts of takings that are compensation clause and are governed by the customary international law of takings or expropriations. It was regarded as not much of a deviation from the restrictive theory of sovereign immunity. What's being urged here would be a radical departure from that because it would open U.S. courts to adjudicating whether foreign governments had engaged in serious human rights abuses. Here, it may be everybody agrees that there was a genocide and that a human rights violation occurred. In response to that, in fact, that's what the United States has urged the countries involved to be responsible for. In other situations, the court might be asked in the first time, in the first instance, to decide whether there was an Armenian genocide, for example. Thank you, Counsel. Justice Kagan? Mr. Kneedler, I think you're going to Congress probably wasn't thinking about this case when it has A3, but that's not always what we consider most relevant. What is your best evidence that this language that is used in A3 is a term of art with a specialized meaning, as opposed to ordinary language that should be read in an ordinary way to comprehend these claims, whether or not Congress thought about the question at the time? Well, I mean, I think there are a number of things that reinforce that. First of all, the entire phrase is taken in violation of international law, which requires reference to the international law as it was understood at the time. The restatement at the time, Section 185, and this court has looked to the restatement in the past to inform its understanding of the FSIA. International law at the time recognized the international crime of genocide, correct? Yes. I'm sorry. But in 76, yes. But I think what's important to look at is that the phrasing is property taken, which we think connotes or calls up the concepts just like in our own Fifth Amendment referring to property taken. It's true that you have the word taken, but in fact, you don't even have the word taking or confiscation in the way that you have in the Hickenlooper Act. And the restatement, which some people have pointed to, also uses the word taking and makes it very clear that the word alien is all over the restatement. So if I'm just looking at this language taken itself, I say, well, this language covers these the question when taking is wrongful under international law, which is virtually the language of the exception. And then it says that taking by a state of property of an alien is wrongful under international law and the specified circumstances. And this is a position that goes back to Secretary Hall in 1938 to Belmont, to Sabatino. The controversy in Sabatino is whether- Justice Gorsuch? Good morning, Mr. Kneedler. I understand your argument that the Clarification Act only works to address limits on the commercial activity requirement. But H-2 does exempt Nazi-era claims where the action is, quote, based on a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation from members of a targeted and vulnerable group. Doesn't that seem to anticipate that there will be such claims that can be brought under A3? I think what it does is recognize that some such claims have been brought, but it doesn't pass on the question of whether they are valid claims. It serves the purpose of granting those claims an additional immunity, in a sense, by saying that if the property is brought in to the U.S., it doesn't count as commercial activity. But it otherwise refers to a taking within the meaning of B3. And that refers back then to what A3 means. And we think it was clear now that it is limited to the international law of expropriations, which has to do with whether there was adequate compensation and a public purpose. If Congress, though, isn't disadvantaging Holocaust-era claims the way it wishes to disadvantage other claims, what should that tell us? That there was a, I suppose, special solicitude in not cutting off those claims. Again, it only applies when the property is brought in to the United States. And if Congress was acting on the assumption or even the belief that some claims were valid, that still is the view of a later Congress. It didn't change the language. And this Court has often said that the view of a later Congress is a very limited force when it comes to interpreting something that was enacted here almost 40 years earlier. Again, Justice Kavanaugh? Thank you, Chief Justice. And good morning, Mr. Kneedler. You've explained what you think the statutory phrase means, but I just want to explore the rationale behind the distinction. So what, in your view, is the justification for denying compensation to citizens of the country in question? Or maybe stated the other way, what harms would result from recognizing claims that outweigh the benefits of recognizing the claims? Well, several things. It's an aspect of the rule of state responsibility to other states. And so when the expropriating state takes the property of another state's nationals, that is offending the rights of that state. And that individual, Congress concluded, should be able to sue. But corresponding to that, this Court has often said in Sabatino and elsewhere that that principle is limited to the taking the property of aliens because, as a general principle, the treatment of a country, of its own nationals, is not a matter of international concern. So what was, and if a state, and this was true in communist states, this was the controversy at the time, many states believed that they could take their citizens' property without compensation. And the act of state doctrine in Sabatino did not interfere with that at all. All of those cases and discussions took as a given that there would be no compensation, or the U.S. could not enforce a rule of compensation for an expropriation by another country of its own nationals' property. That was a given. The controversial point was the one the United States was urging about whether international law even spoke to the question of expropriating the property of nationals. And the restatement and the expropriation exception are an expression of Congress's view of U.S. policy. Yes, that that does violate international law, but that's as far as it goes. And that is what Congress was driving at in enacting the FSIA, not opening U.S. courts to broader human rights violation claims. Thank you, counsel. Justice Barrett? Mr. Kneedler, I have a question about what the Clarification Act should tell us about the expropriation exception. So in showing special solicitude for Nazi-era claims, the Clarification Act clearly assumes that some such claims against Nazi-era confiscations of property would be going forward, and that the Foreign Sovereign Immunities Act would not bar them. So if your interpretation of the expropriation exception is correct to say that it applies only when there's a foreign national suing a government for the taking of property, what kind of class of claims are those? I guess that would open up some of the difficult questions of nationality and citizenship that Justice Alito was asking you. But could we expect there would have been or was there a large subset of claims brought against Nazi governments, Nazi-controlled governments by foreign nationals? What is Congress referring to there? Well, several things. I mean, like Altman was a case by a foreign national against Austria. But I think the bigger point is that Congress knew there were such claims, but I don't think that is the same thing as Congress determining that they fell within the Expropriation Act. In fact, again, the Clarification Act simply refers to the taking of property within the meaning of A3, which refers one back to what A3 means. So really what Congress was doing was not taking away the opportunity of someone who had such a claim to rely on Malone of property to a U.S. museum as establishing the commercial nexus. But it didn't do more than that. And I think the court should insist upon a much more explicit and conscious determination by Congress to open up U.S. courts to these sorts of claims, which are far beyond what Congress had in mind when it enacted the FSIA. Thank you, counsel. A minute to wrap up, Mr. Kneedler. Thank you, Mr. Chief Justice. An important thing to remember here is that the Foreign Sovereign Immunities Act was a codification of the restrictive theory of sovereign immunity, and it adopted a general rule of immunity subject to exceptions. This court has referred to that as a presumption of immunity, and this court should enforce that by insisting upon a clear statement by Congress to depart from the restrictive theory. The problem here, beyond the statutory text and context and background and structure, is the fact that this would put courts of the United States in the business of making sensitive judgments about the conduct of foreign governments, including perhaps some of our closest allies, and invite other countries to open their courts to acts that everyone would now regard as violations of the law of nations. So this court should adhere to Congress's understanding and intention of limiting the expropriation exception to circumstances involving the taking of property by foreign nationals in the traditional sense of requiring the compensation and not tied to the violation of international law. Thank you, Mr. Kneedler. Mr. O'Donnell? Mr. Chief Justice, and may it please the court, the Foreign Sovereign Immunities Act provides jurisdiction over cases in which rights and property taken in violation of international law are an issue. The ordinary and natural meaning of that phrase, chosen by Congress, applies to petitioners' property takings during the Holocaust. The Nazis deemed German Jews to be non-German, aliens outside of the rule of law, at the moment the regime began on January 30th, 1933, and took their property because of who they were. I was puzzled to hear the suggestion earlier that we have not raised that issue because we have framed the case in those terms since the complaint and at every stage since. This court in Helmerich noted the potential that a sovereign's takings of its own national property may amount to a violation of international law. If that logic did not apply to Nazi forced sales from Jews, when would it apply? Petitioner Germany also committed genocide, which is itself a violation of international law. The Nazi government set out explicitly to destroy the German Jewish people by taking their property, and Congress has specifically identified the Nazis' looting of art from the Jewish people as genocidal. This is not a new kind of human rights case. It's a property rights case. Briefly with respect to comedy, sovereign immunity is the broadest expression of what Justice Breyer this morning called a motivating principle, and Congress in 1976 created a comprehensive non-discretionary framework for that motivating principle. Petitioner's newfound status-based comedy abstention argument would trample the FSIA out of existence. As Ms. Harrington said, what sovereign defendant would not claim a paramount interest in property within its own territory. Every one of the takings of property of aliens that petitioners say are covered by the law would immediately face this assertion. Congress has set the rules, and the court need not rewrite them. Counsel, what do you do with the International Court of Justice's determination that it would in fact be a violation of international law to refuse to grant immunity to a state for expropriation of its own national property? Mr. Chief Justice, I think the answer is one that Ms. Harrington provided and that Mr. Kneedler in part conceded, and that is that there is no other nation that provides jurisdiction for expropriations in this way. So if the expropriation exception would violate international law, it already has, and it already has for almost 45 years. Well, what is your best evidence that there is a genocide exception to the general rule that the expropriation exception is limited to the taking of foreign nationals' property? Mr. Chief Justice, I think there are two answers to that. One is that, as was alluded to in an earlier comment, genocide was already recognized as a violation of international law in 1976. But at that time, the expropriation of a nation by its own nationals' property was not recognized as a violation of international law. I think respectfully, Your Honor, that the state of that understanding is a little less solid than petitioners suggest. I think one of the things you see in the congressional record, you see in the advocates brief by Mr. Feldman in the Hungary case, for example, is that it was a bit of a jungle as to how to treat expropriations from citizens. And the restatement addresses when a taking of property from an alien violates international law, but it's a section about takings from aliens. And it's not as clearly laid out as the Genocide Convention, which had been codified all the way back in 1948 and was well within the view of Congress. And the second is, this specific historic episode had received considerable treatment by U.S. policymakers and the executive, in particular, the letter from Mr. Sims, to remove any constraint upon the exercise of jurisdiction over the acts of Nazi officials. Well, obviously, there's no issue in this case. But how do you decide, in other instances, whether or not the taking is in the context of more general violations of human rights, so that you fall within this? In other words, how broadly would you articulate the, if you want to call it the genocide exception to the normal rule? Now, of course, the first answer is, you know, whatever it is, it covers this case. But do you have a more general rule that would be applied in other situations? Your Honor, I have two. The first is, when the claim has to sound, as you said, in OBV, the grobbing has to be about the taking of property. And if you look at the other human rights norms, in Judge Cassis's dissent, for example, they do not implicate the taking of property. Torture is not caused by the taking of property. In fact, the Torture Victim Protections Act specifically eschews torture by deprivation of anything or a cause of anything other than physical anguish. So the first is, the claim of the international human rights norm has to sound in the taking of property in the first instance. And those other norms do not. And the second position I would say, Your Honor, as the final sort of boundary against all of this is, well, then look to what Congress has said. Has Congress recognized this episode of property taking as a violation of international law or a genocide? The list, that list is vanishingly small. And even those instances that Congress has recognized as genocide after considerable debate, fewer of those still, again, the Genocide Convention has multiple avenues, if you will, to the commission of genocide. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, can you give me any example of genocide where property has not been involved? It seems like it is. I think of whether it's Armenia, or the Ukraine, or Germany, or up in the Baltic states, that whenever that's occurred, there's been a loss of property, or a taking of property. So wouldn't virtually every one of those involved be covered by your argument? Not necessarily, Your Honor, because even those genocides recognized or commonly understood, recognized as such, again, there may be property takings that happen alongside the genocide, but the Genocide Convention, a genocide can be committed, as I've said, in multiple ways. And if you kill the members of the group, and then you take their property, the taking didn't cause the genocide, it was alongside it. But if you take the property, as Germany did, explicitly to destroy the group of people and remove it from the face of the earth, you commit a genocide through the taking of property, which is the focus of the expropriation exception. Well, I don't understand how, what would make a difference to have one sequence versus the other, that you commit the genocide before you take the property, or the property before you take the before you commit the genocide. But with that aside, we've said, I think, in other cases that the expropriation exception was not a radical departure. And wouldn't you are reading it, as you do, be just that a radical departure? With respect, Your Honor, no, because I would admit that if there was any taking of property recognized in 1976, as in violation of the law of nations, it was what this petitioner did between 1933 and 1945. It is not hard to imagine at all. In fact, I think it's the opposite. I understand that. But I'm talking about your, really, your reading of FSIA. That wouldn't that be a radical departure from more of more restrictive theory? I don't think it would, Your Honor, it would be a departure from the restrictive theory of question, or from the restrictive theory as it appeared. But that, that view changed over time. And again, I come back to the author of the letter that announced the restrictive theory in 1954, 1952. And that's Mr. Tate. And genocide in this way, we can be thankful there are not other examples like it. It cannot be repeated enough. There is no paradigm like the Holocaust. And there is no second case that fits into the allegations of the Holocaust. Messerhain, the 11th Circuit case relied upon by petitioners, points this out. The Venezuelan victims in that case tried to say, well, we are sort of being treated unfairly and like foreign nationals, like the Nazis treated people. And the 11th Circuit said, that's absurd. That's absurd. There's only one Holocaust. If we have some doubts about whether or not you preserved your alternative standing argument, should we just remand that to the district court to consider in the first instance? Alternative standing in what respect, Your Honor? Well, I mean, if you, your argument, you're arguing obviously an interpretation of FSIA, but you also have an argument that, that you just made, for example, that genocide, that the taking is genocidal. Was that preserved? Yes, Your Honor. We, we, we allege in the complaints and have said at every stage since that Nazi Germany's treatment of the consortium as non-Germans is a violation of international law. The petitioners raised the domestic takings rule in their motion to dismiss the first amendment complaint. And when you've been arguing about it ever since, I really don't understand petitioner's argument that this has not come up before. Thank you. Justice Breyer. It seems to me that you could read this language to refer to what was expropriation. That was the communists. That was Nasser. That was sometimes in South America, Venezuela, et cetera. And they're talking about expropriation. And the other way would be to read it as you read it. They're just talking about property involved in a violation of international law. And it's just as Thomas others have pointed out. It seems to me there are loads of violations of international law involving, in, in violating, uh, uh, that involves property, not just genocide. And so an argument that's made against your side is look what you're opening up. I mean, you can have slavery involving property. You can have systematic, uh, discrimination. You can have, uh, cruel and I'm human degrading treatment. I mean, the list goes on and on of what violates international law and many of them involve property. And if we can bring these kinds of actions here, well, so can these other countries do the same and accuse us? I mean, what about Japanese internment, which involved 30,000 people in world war two who were not American citizens, but were of Japanese origin. And the first time we choose China for the Warringahs or whatever, you know, what do you think they're going to say about the, the, the, uh, uh, railroad workers who came to the 19th century? I mean, that seems no way to limit it. According to a principle that would say we should have the actions here that are universalizable and won't hurt to chaos if they're brought everywhere. And that's a fairly strong argument. And so I think, but that's why I want to hear you answer it. Your honor. I think the first response to that is that it could easily be limited to instances where Congress has identified the episode or the in those terms. And again, that's a very short list. I don't know that it extends any further than the Holocaust and world war two. Why isn't it, why isn't it a taking a property in violation of international law where in country X, they have child slavery involving children from other countries and they take the property in D whether or not you call it labor as a property, they take other property too. And so they come to court and 700 judges in this country, uh, passed judgment on that. Why doesn't that fall within the language? Because the violation of the international norm, your honor, doesn't cause the defamation. Why doesn't suing them into slavery, bringing them into slavery doesn't cause the deprivation of the house they own in the adjacent country. It doesn't involve the deprivation of sometimes their clothing and sometimes their gold teeth, as justice Thomas said. I mean, terrible things happen in this world. And that's why I was somewhat moved by that statement, but the way to go after them practically is to all kinds of mediation, arbitration, and other kinds of special agreements and not necessarily 700 judges. Well, your honor, I'll take that second point first, because as Mr. Harrington alluded to, I think it's actually the reverse. The existence of those claims is what led to the Berlin Accords and the resolution at a broad level of banking plans that were substantial and sweeping. And it was the prospect of facing those litigations that brought the parties to the table. In this case, Congress has recognized, sure, it's better that we can work it out, but it's clearly not possible. That's what the HERE Act says. Congress stated a strong, unanimous policy in 2016 that these claims survive. Again, to go back to the Clarification Act, if Congress has recognized it, there really isn't a need, I think, for a further inquiry. Justice Alito? I want to make sure I understand the scope of your argument. At times in your brief, particularly when you refer to the absence from the provision in question of any reference to aliens, you seem to be making an argument that would apply to any domestic taking, but that's not your argument. Am I right? No, we still need to violate an identifiable norm of international law. Okay. So is it your argument that any taking that violates any principle of international law would be covered, or is your argument limited to those acts that constitute genocide or those that are part of the campaign of genocide, or is it a Holocaust-specific argument? My argument, Your Honor, is it extends certainly to genocide, it extends certainly to the Holocaust, and it would extend to other norms of which I can't think of any, whereas I said to Justice Breyer, it is the violation of the norm itself that causes the property taking. Well, since World War II, customary international law has expanded greatly. Prior to World War II, it was largely, if not entirely, limited to relations between nations, but in reaction to the Holocaust, to those horrors, customary international law has reached out and now protects many human rights. So would your argument apply to any taking that violates any principle of human rights recognized by customary international law or by treaties since the number of occasions that the understanding... Okay, well, most of that work was done. A lot of it was done before 1976. Would it include everything recognized up to 1976? Your Honor, I'm not sure I have the same view of how much of that work had been done by 1976, but if the norm violation caused the property taking, yes. Even if it's limited to genocide, there have been many incidents in the past that some people claim are genocidal. Sometimes these are hotly disputed. I won't go through the list. I hope there won't be more in the future, but given human nature, that's a possibility. Wouldn't your argument require courts to decide whether a particular event that indisputably involves atrocities amounted to genocide? They might be faced with that threshold question, Your Honor, and in that instance, as we've said, I think the easiest signal post, as in the rest of this law, is to look what Congress has said about that alleged episode. Well, on what ground would we say this includes genocide, but only those that have been specifically recognized in some other statute that does not govern this particular case? What would be our justification for drawing that distinction? It would be to determine the scope that Congress intended through the passage not only of this law, but of other laws on that topic as to that particular case. Now, in this case, the FSA itself has been amended to include the episode at the heart of this very case. So, didn't the meaning of the FSIA change based on later congressional legislation? No. And how would we read that back into our interpretation of the FSIA? Well, then, I suppose, Your Honor, you'd have to look at those genocides that Congress had recognized as of 1976. So, this would apply only to past genocides? It wouldn't apply to any that we're talking about today. No, I think I would walk that back, actually, Your Honor. I think if Congress expressed itself squarely in those terms, it would apply. Thank you. Justice Sotomayor? Counsel, let's assume we accept your adversary's position, that the FSIA has to be read to was the customary international law that limited its application to non-nationals. Just articulate for me, what do you see as left in the case? Do we reverse and direct dismissal? Do we reverse and remand, and for what? Your Honor, I think you affirm, because the we don't, if we assume your opposition's position, what would you ask us to do then? As applied to the allegations of German residents, specifically in our case? I see your case. He wins. He presented a question. We say he's right. The customary international law does not apply to the takings of nationals. That's the rule we set. What's left of your case? I suppose, Your Honor, that what's left is a remand to determine if under a relatively unaddressed part of the case, in terms of the scope of nationality, a remand to answer that question, whether in this case, as Amiki has ably demonstrated, that German governmental treatment of German Jews in the 1930s would transgress that nationality line. I think the answer is clear, but the court may determine that it hadn't been addressed below. It needed to be. One of the things that I'm dealing with in my own head is, how would we determine, I know it will be Amiki makes their argument, but given that there hasn't been a recognition of causes of actions against sovereigns in other countries for expropriation of property within the borders of a nation, how will we ever determine that question? How can we ask the court below to determine that question outside of an academic discussion? Well, I think that's a question of fact in a particular case. I mean, and it may require the submission of historical expertise. Thank you, counsel. Justice Kagan? Mr. O'Donnell, Judge Cassis, in one of his dissents, made the point that your position would create a kind of strange dichotomy, whereby victims of the Holocaust could bring suit for property deprivations, but their relatives could not bring suit for their deaths. So why would that make sense? Justice Kagan, that dichotomy already exists, even in the classical expropriations that petitioners assert are the limits of the law. I'll give you an example. Let's assume that someone in Venezuela had been tortured by the Hugo Chavez government. That person could not sue under the FSIA. That person was a foreign national. That person could not sue under the FSIA, but they could sue if the Venezuelan government took their property. That's the dichotomy that Congress has factored into the exception itself. Let's go back to Texas a little bit here. What more do you think Congress would have had to say to limit it to sort of standard international law expropriations? I think this goes back, Your Honor, to the term of art question, and I think maybe if Congress had said concerns rights and property or concerns takings in violation of international law, I think this goes to your questions earlier, and a question you posed in the Elmhurst oral argument. They could have phrased this in a different way that more obviously implicated a body of law. I think petitioners— Is that slicing the salami pretty thin, you know, taking versus taken, when we know what they were talking about, really? I don't think so, Your Honor, because, again, to be a term of art, it has to be specific. It has to be used similarly elsewhere. Even this phrase doesn't appear in the second Higgins Amendment. The words international law do, but the context, as petitioners would put it, around that phrase is slightly different, and so if Congress is using slightly different words, we must assume it had a slightly different intention. Maybe we should forswear the kind of ordinary meaning textualism that you are asking us to adopt in this context. Mr. Kneether said we've long understood that the FSIA codifies the restrictive theory of sovereign immunity, which, except for narrow exceptions, gives the foreign sovereign immunity for public acts. So why, in that context, shouldn't we be thinking a little bit more than we typically do about actually what Congress had in mind when it drafted these exceptions? Well, I think, Your Honor, certainly a plain textual interpretation has the benefit of simplicity. In this case, if you are interested in the context and you look to the legislative history, which I urge the Court to do, first, in the 1973 hearing, Hitler's takings of art came up that made clear that there's no limitation in mind. Again, this was a fairly expansive discussion, both in terms of the hearing and the back-and-forth, and as you said earlier in this argument, O'Neill is all over the restatement, and it's not in this case that the low stars are taking, without adequate and fair compensation, not for public purpose, but arbitrary and discriminatory, and it would have been very easy somewhere in those hearings, let alone in the law itself, for someone to say, but of course, we're only talking about the property of aliens. They didn't. Thank you, Mr. O'Donnell. Justice Gorsuch? So, Mr. O'Donnell, if I understand it, if Congress had said, used the word taking rather than taken, you'd admit you'd have a much harder case? I think we'd have a harder case, yes. And that's because taking is a term of art, and taken is not? I don't know that I agree that taking is a term of art, Your Honor, but I think it's a lot closer to one, and it's the sort of term, like those that appear in the cases cited by Petitioner, prevailing party, costs, just in case of evidence, things that are recurring terms in the law. What do we do about the fact that the statute uses the word taken? The then restatement spoke of international law takings, takings in violation of international laws, in the manner that your opponents suggest. This remained true despite knowledge of the Genocide Convention and the Hague Convention, which would have contained language more like you're asking us to read into this statute. Then you've got the Hickenlooper Amendments as well, and that's all before we even get to some of the other statutory clues that Judge Katz has pointed out. Why doesn't that, as a matter of ordinary meeting at the time of the statute's passage, stand as pretty strong evidence against you taking collectively? Because those elements of international law, Your Honor, are restrictive and not defining. The restatement second, Section 185, is in a chapter entitled, Taking of the Property of Aliens. The fact that taking of the property of aliens violates international law does not mean that that is the extent of international law. The Sabatino-Hickenlooper Amendment bears this out because the second Hickenlooper Amendment refers back to violations of international law, including those in this section, and those in this section are takings from United States citizens. So it is exemplary, but not exhaustive. Okay. And then if your contrary reading were correct, I think you've agreed that property takings were taken, if you will, because of a genocide is not going to be the limit of our jurisdiction. It's also going to include any other human rights violation norms that somehow related to property. I would have thought terrorism, slavery were a couple of examples we've batted around. I'm sure there are going to be many others, but I'm not understanding what your limiting principle is. It seemed to be some sort of causation analysis. Can you explain that to me a little bit further? Yes, Your Honor. And I actually think that the court's guidance in OBB is instructive on this, right? The commercial activity exception asks if the claim arises out of commercial activity in United States. And the court was very clear that that doesn't mean but for, that doesn't mean alongside of which, right? The plaintiff in that case wouldn't have been injured in Austria if he or she hadn't bought the ticket in the United States, but that wasn't enough. And those other human rights norms that I mentioned, and that just passes mentioned, the violations are not caused by the deprivation of property. You can't torture someone by taking his or her property. You may take someone's property when you impress them into involuntary servitude, but the taking doesn't cause the servitude. And so you would say here that taking a property caused a genocide, but taking a property doesn't cause terrorism or slavery. Is that your argument? Yes, because the genocide convention acknowledges deliberately inflicting on the group conditions of life calculated to bring about physical destruction in whole or in part. That's precisely what Nazi Germany did. And no one doubts that this was part of a horrific genocidal conduct by Nazi Germany in the Third Reich. But I don't think anybody would contend that the taking of property was the only, or maybe even the most grotesque aspect of the genocide. And I don't see why the same couldn't be said of other human rights violations, like slavery, like terrorism. I'm sorry for going over, but I appreciate your response. Sure, if I may. It's because, Justice Gorsuch, the MSAA and this exception is concerned with property. And as I said before, there is a discrepancy between the treatment of property claims and personal injury claims or other human rights claims. That's a discrepancy that exists even in the petitioner's reading of the statute. Thank you. Justice Kavanaugh. Thank you, Chief Justice. Good afternoon, Mr. O'Donnell. I'm interested in whether you could have brought this suit in any country other than Germany. In other words, does any other country waive sovereign immunity for foreign nations' domestic takings? I am aware of none. None. And that would suggest, I suppose, that there is a universal norm or close to universal norm of international law to provide immunity for foreign nations in those circumstances, at least immunity in courts outside their own countries. I think that's the default rule, yes, Your Honor. Then on the question of the text, the argument is really the term of art argument. Did this language have a settled meaning at the time? And we've explored that back and forth a little bit. Justice Thomas, I think, asked you whether your reading of the FSIA would be a significant departure. And you said no, a significant departure from the understanding at the time. You said no. One thing I wanted to ask you about and give you an opportunity to respond is the current restatement, the Restatement Fourth, you're well aware the reporter's note to Section 455 says that by eliminating the domestic takings rule and permitting claims to proceed on allegations of the takings occurred in the context of egregious violations of international law, this line of decisions, referring to the current cases we're talking about, this line of decisions appears to expand the scope of 16583 well beyond the original intent of the Congress, potentially opening courts in the United States to a wide range of property-related claims arising out of foreign internal conflicts characterized by widespread human rights violations. So what's your response to the reporter's note in the current restatement saying that this line of decisions goes well beyond what Congress would have understood? Your Honor, my response starts with where I began today, and that's the court's musing, if nothing else, in Helmreich that there may be a category that violates international law. And I think, again, as to what would have been understood in 1976, I know I keep talking about my case, but this episode, of course, was the paradigmatic episode of taking an international law violation in 1976, and I think it would have been well understood by that Congress. I looked this up in the president. I think, to pose the inverse of a question the court that I think Justice Alito raised in his post-op dissent, I think the Congress would be shocked in 1976 to hear the suggestion that Nazi Germany's property taking didn't violate international law for the whole of the regime. Thank you. Justice Barrett? Counsel, the distinction that you're drawing between taken and taking seems awfully thin to me, because I'm looking at 1605A3, and the way that it's drafted, I mean, one could say with reference to our takings clause, in which rights and property taken in violation of the takings clause, or in violation of the Fifth Amendment, I mean, and moreover, when you go to the Clarification Act, it does use the word taking, and the way that 1606A3 is drafted, it would be hard to say anything other than taken. So, really, does your argument depend that much on the distinction between taking and property taken? No, Your Honor, and if I can clarify, no pun intended, Justice Kagan asked me about what other word might have led to a different result. I'm not arguing that taking would dispense with earlier. The Clarification Act, taking or taken, refers to the whole of the regime, and it would make no sense, this just comes back to the textual principles that I talked about before, it would make no sense to encompass that whole era if it meant to exclude a certain category of takings in a certain date range that Congress didn't say. But Mr. O'Donnell, a lot of the force of your argument depends on the ordinary meaning of the terms, and relying just on, you know, property taken in violation of international law, rather than saying it in a term of art way. But at the same time, you've pointed to all kinds of limitations that might exist outside of that ordinary meaning of the text. For example, this is just genocide, or just if Congress calls it genocide. Can you identify some of the limiting principles, so you said maybe this is just the Holocaust, the Nazi Holocaust, or maybe this is just genocide, maybe it's just a genocide if Congress identifies it as such? Are those the only limitations you might find in that text? Your Honor, I think the plain meaning of the phrase is the starting point. Is the episode in the hypothetical case number two, does it raise, does it put rights and property taken in violation of international law in issue, right? Are those things in play? And if you read that and look to the episode in question, um, you don't have to limit yourself. I'm not saying you have to limit yourself to the text and learn nothing else from other words or context. I'm not saying that, because of course, I think the context supplies the answer as well. And in that hypothetical case, you would say, what is it about this episode that did or did not violate international law? Okay, the concept is very difficult to see. An example is that Justice Gorsuch was giving you, for example, how property taken in the course of enslaving people wouldn't fall into this very same logic that you're articulating here. I think you're struggling to identify limits, because you know that it's problematic to interpret it so broadly, that it would have the 700 district judges in the country adjudicating all these kinds of claims. Well, but I think the limiting principle justice there remains the taking itself. What was the, what is the property taken the violation of international law, and that assumes that the norm you're talking about was breached through the deprivation of the property itself. Thank you, counsel. I'm out of time. Also, you can take a couple of minutes to wrap up if you'd like. Thank you, Mr. Chief Justice. Petitioner's argument boils down to this, that despite the absence of language in the FSIA as originally passed that would limit claims based on the nationality of victims of government property takings, and despite the presence in the Clarification Act of language specifically recognizing the full extent of the Nazi regime's art looting and forced sales as properly within the expropriation exception, a unique among Nazi victims, Congress intended to disadvantage the Nazis' first victims, German Jews. This makes no sense. With regard to comedy, which I know we have not spent much time on, I would say the FSIA says to district court judges, the defendant is immune unless an exception applies. And I think in this circumstance of the game of baseball, the judge in that scenario can be thought of like the umpire in the baseball game, whose rules say the batter gets four balls or three strikes, creating a status-based new comedy extension doctrine to avoid the FSIA, would be like telling that umpire that even when the batter strikes out, the umpire can still award first base if the batter is important enough or really wants to get to first base. But to do so would be to legislate where Congress has not. Thank you. Thank you, counsel. Three minutes for rebuttal. Mr. Fryman. Thank you, Mr. Chief Justice. A couple of small points and then I'll wrap up. First of all, the Clarification Act, I think it's important to remember that it only involves art that is physically present in the United States. That's a consequential distinction when we're talking about foreign sovereign immunity. Second of all, with regard to what to do if you find that the expropriation exception applies only to violations of the international law of takings, this is not a situation where remand is appropriate. The plaintiffs have never claimed that the consortium or the firms or their ancestors were not German nationals. You won't find a paragraph in any of the briefs at any stage of this litigation. This is something that should be resolved finally here. In sum, the court's been given two literally possible meanings. Ours is consistent with the background that Congress was legislating against and with the understanding of the term taking in violation of international law as it was understood in the restatement, which this court has used to understand FSIA exceptions in the past. Even if the plain text doesn't decide, you should look to the canons and all of them cut in our favor. I'd like to highlight three of them. First of all, clarity. In Helmrich, this court held that clarity in jurisdictional statutes, especially regarding foreign sovereigns, is particularly important. It's a doctrine with enormous diplomatic consequences and Congress knew that clarity was important. It didn't create an exception letting foreign sovereigns be sued for sovereign acts without knowing the boundaries that it was legislating. Under our interpretation, Congress knew them. International law of takings, a doctrine that the U.S. had long advocated for with a specific content and coverage. Under the plaintiff's interpretation, Congress didn't know the boundaries. It was any principle of international law. That's a big set, one that can keep changing. Congress didn't want to lose control of a sensitive diplomatic area like this. Second, their reading would ignore judicial interpretations of the very similar language of the second Hickenlooper amendment. And there's no doubt that Congress knew of that. The statute was cited in the committee report here, as was the case by this court, Alfred Dunhill, repeatedly citing the prior judicial interpretation of the second Hickenlooper amendment just a few months before the FSIA was passed. Third, their reading would violate the international law of state immunity and rip a large hole in the restrictive theory that Congress was codifying. My friend tries to limit the consequences to genocide, but the genocide convention doesn't use the word takings or taken. And as several members of the court have noted today, slavery, systematic racial discrimination, and other norms like crimes against humanity or the laws of war can all involve takings. Almost 700 judges, as several of you have noted, would sit as new world courts judging the nations of the world for alleged violations of international human rights and the law of war. Much more should be required from the text to reach this result. Thank you. Thank you, counsel. The case is submitted.